ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 28 2011

CLERK, U.S. DISTRICT COURT
By _____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LINDA S. WOODS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-1500-L-BF |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The District Court referred this matter to the United States Magistrate Judge for findings and recommendation. Linda S. Woods ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and for Supplemental Security Income ("SSI") under Title XVI of the Act. The Court has considered Plaintiff's Brief, filed November 12, 2010, and Defendant's Brief, filed December 9, 2010. The Court has reviewed the parties' evidence in connection with the pleadings and hereby recommends that the Commissioner's decision be REVERSED and REMANDED for reconsideration in line with this opinion.

### I. BACKGROUND[1]

*A. Procedural History*

Plaintiff filed applications for DIB and SSI on September 18, 2003, claiming a disability onset date of June 25, 2003. (Tr. 218-20.) Plaintiff alleged disability due to problems with her knees

---

[1] The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

1

and lower back. (Tr. 853.) Plaintiff's application was denied both initially (Tr. 129-35) and upon reconsideration. (Tr. 121-24; 129-35.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 120.) The ALJ conducted the *de novo* administrative hearing in Dallas, Texas on February 3, 2006. (Tr. 841-904.) Plaintiff appeared at the hearing and testified. (Tr. 841-904.) A vocational expert ("VE") also testified. (Tr. 841-904.)

On March 31, 2006, the ALJ issued his decision finding Plaintiff "not disabled." (Tr. 99-108.) Plaintiff requested and was granted a review by the Appeals Council. (Tr. 109-12.) On review, the Appeals Council remanded the claim to the ALJ for a new hearing and decision. (Tr. 109-12.) The Appeals Council directed the ALJ to: (1) evaluate and address the opinion evidence of record; (2) discuss how the medical opinions, prior work record, daily activities, medications and side-effects, and treatment other than medication were considered in the credibility evaluation; (3) cite specific evidence that supports the claimant's residual functional capacity ("RFC"); and (4) obtain supplemental evidence from a VE and present a hypothetical question reflecting the claimant's capacity established by the record. (Tr. 110-11.)

On May 22, 2008, after a second hearing, the ALJ again found Plaintiff not disabled (Tr. 67-77; 905-57.) The Appeals Council denied review of the ALJ's decision. (Tr. 5-8.) On August 2, 2010, Plaintiff filed this case seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g). (Doc. 1.) This matter is ripe for consideration on the merits.

*B. Factual History*

1. Plaintiff's Age, Education, and Work Experience

Plaintiff was born in 1968 and was 34 years old at the onset of her alleged disability. (Tr. 218.) Plaintiff did not complete high school and has not obtained a GED. (Tr. 851.) Plaintiff has work experience as a housekeeper and a cook. (Tr. 75.)

2. Plaintiff's Medical Evidence

**A. Ronnie Shade, M.D.**

On September 11, 1998, Plaintiff received an MRI of her knees that showed left knee hypertrophic degenerative changes, early chondromalacia patellae, and findings suggestive of an old injury to the medial collateral ligament and right knee hypertrophic degenerative changes, chondromalacia patellae, and findings suggestive of a tear of the lateral collateral ligament. (Tr. 292-93.) An MRI of Plaintiff's lumbar spine showed desiccation in the L4-5 intervertebral disc and generalized bulging of the annulus fibrosus at the L5-S1 level. (Tr. 293-94.)

On October 12, 1998, Plaintiff visited Dr. Shade for an evaluation of her knees and lower back. (Tr. 287.) Dr. Shade noted that Plaintiff required hand assistance in arising from the chair and getting on the examination table, a slow and slightly antalgic gait, bilateral iliolumbar tenderness and spasms, limited motion in the lumbar spine, 1+ effusion of the right knee, patellar apprehension on the right, positive McMurray test on the right, medial compartment tenderness, 1+ subpatellar crepitus and pain on the left and 2+ on the right, and plica noted on the right. (Tr. 288-89.) Dr. Shade diagnosed contusion/sprain with condromalacia, patella, post-traumatic bilaterally of the right greater than left knees, suspected right meniscal tear, plica of the right knee, chronic lumbar strain, lumbar

disc desiccation at L4-5, and lumbar disc bulge at L5-S1. (Tr. 289.) Dr. Shade prescribed medications and recommended that Plaintiff stay off work and undergo physical therapy. (Tr. 289.)

On January 5, 1999, Plaintiff underwent surgery on her right knee. (Tr. 290.) Dr. Shade diagnosed right knee chondromalacia of the medial femoral condyle and patella and recommended physical therapy. (Tr. 290; 315.) After the surgery, Dr. Shade prescribed Cosamin, Motrin, and Darvocet and recommended advanced physical therapy and rehabilitation, weight reduction, and use of a knee cage. (Tr. 311.)

Plaintiff's symptoms persisted unchanged through July 23, 2001. (Tr. 308.) Dr. Shade noted that Plaintiff might need a total knee replacement and recommended Synvisc injections, use of a TENS unit, Motrin, Ultram, and Glucosamine. (Tr. 308.) On September 12, 2001, Plaintiff complained of progressive right knee pain that was worse at night and with change of weather and pain that awakened her twice each night (Tr. 285.)

On September 15, 2003, Plaintiff returned to Dr. Shade with complaints of lower back pain and increased right knee pain. (Tr. 306.) Dr. Shade prescribed Ultram and recommended evaluation for a total knee replacement. (Tr. 306.) On September 23, 2003, Dr. Shade aspirated the right knee and injected it with Decadron and Marcaine. (Tr. 282.) Plaintiff reported no improvements to her pain through January 7, 2004. (Tr. 300.)

An MRI of the right knee taken May 10, 2005 showed moderate to severe tricompartmental degenerative changes, worse at the anterior and medial compartment with chondromalacia, underlying subchondral osseous abnormalities, and marginal osteophytes, remote injury of the medial collateral ligament, focal fraying at the free edge of the body of the lateral meniscus, moderate joint effusion, and patellar tracking abnormality. (Tr. 365-66.) Dr. Shade reported that

Plaintiff suffered from degenerative joint disease, chondromalacia of the patella, lumbar disc desiccation, and a lumbar disc buldge. (Tr. 296.) He opined that Plaintiff was "permanently disabled." (Tr. 296.)

In a 2009 report, Dr. Shade concluded that Plaintiff suffered from progressive moderate degenerative joint disease in two of three compartments of the knee. (Tr. 723.) Dr. Shade noted that Plaintiff was limited in prolonged standing, walking, bending, stooping, lifting, carrying, squatting, and climbing and that these limitations were consistent with Plaintiff's medical history. (Tr. 723.)

### B. Parkland Health & Hospital System

On October 29, 2005, Plaintiff was brought to the Parkland emergency room after attempting to commit suicide by overdosing on Etodolac. (Tr. 325.) Plaintiff was diagnosed with depression and morbid obesity. (Tr. 330.) On July 27, 2006, Plaintiff was diagnosed with bilateral knee arthritis and given a prescription for Etodolac and Hydrocodone. (Tr. 499; 503.) On February 26, 2007, Plaintiff visited the emergency room at Parkland with complaints of right leg swelling and was prescribed Etodolac and Robaxin. (Tr. 447-48.)

Knee X-rays taken Febrary 28, 2007 showed left ossification and right central osteophyte arising from the medial femoral condyle, as well as bilateral mild to moderate tricompartmental degenerative changes, most pronounced in the medial compartment. (Tr. 441.) X-rays of Plaintiff's lower back showed severe discogenic degenerative changes present at L5-S1 with moderate changes at L3-4. (Tr. 443.)

### C. R.A. Goldberg, M.D.

Dr. Goldberg evaluated Plaintiff on November 27, 2007. (Tr. 660.) Plaintiff complained of lower back and right knee pain, weight gain, and depression. (Tr. 660.) Plaintiff's weight was

recorded at 278 pounds. (Tr. 661.) Dr. Goldberg observed a modest limp with use of a cane in the right hand, inability to heel or toe walk, inability to squat or hop, very slow and unsteady tandem walking, difficulty changing positions and getting on and off the examining table, limited range of motion to 25% of normal in the lumbar spine, decreased sensation in the entire right leg, minimal knee effusion, and knee joint line tenderness. (Tr. 661.) Dr. Goldberg diagnosed Plaintiff with low back pain and demonstrated severe degenerative disc disease at L5-S1, osteoarthritis of the right knee, and exogenous obesity. (Tr. 661-62.) Additionally, Dr. Goldberg completed a functional capacity assessment in which he opined that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces and could never climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (Tr. 666-68.)

### D. Donald Goldman, M.D.

Dr. Goldman was a non-examining orthopedic surgeon who submitted a report regarding Plaintiff after reviewing her medical records. (Tr. 639.) Based on Dr. Shade's records, Dr. Goldman opined that Plaintiff's condition equaled Medical Listing 1.02A and 1.00B2b and 1.03B2B under the Social Security Regulations. (Tr. 640.)

<u>3. Plaintiff's Hearing</u>

On February 3, 2006, the Administrative Law Judge ("ALJ") held a hearing. (Tr. 914.) Plaintiff testified that she could no longer work due to the pain from her knees and lower back. (Tr. 914.) She described her pain as throbbing with numbness and tingling in the legs. (Tr. 928.) Plaintiff stated that her pain increased with walking and decreased when she was resting and elevating her right leg with a pillow. (Tr. 929.) She stated that she was only able to walk half a block or stand twenty minutes before the pain would force her to rest. (Tr. 940.) Plaintiff reported that she weighed

289 pounds, twenty pounds more than her recorded weight at the onset of her disability. (Tr. 911.) She reported that during the day she would mostly sit and watch television or lie in bed with her leg elevated. (Tr. 935.) Plaintiff claimed to primarily leave the house for doctor's appointments. (Tr. 937.)

A medical expert, Dr. Sterling Moore, reviewed the entire medical record and testified that, as of Plaintiff's alleged onset date of September 18, 2003, Plaintiff did not have impairments that met or equaled a listing for presumptive disability. (Tr. 950.) The medical expert testified that Plaintiff suffered from obesity and pain in the lower back and right knee. (Tr. 946-47.) The medical expert stated that Plaintiff did not meet or equal a Medical Listing because she did not have deformity of the knees or limitation of ambulation. (Tr. 950.) Dr. Moore opined that Plaintiff needed to elevate her right foot during the day and was limited to lifting and carrying 10 pounds, standing or walking two hours with the use of a cane, and sitting up to six hours. (Tr. 950-51.)

A vocational expert ("VE") testified that a hypothetical individual who was limited to lifting ten pounds, standing up to two hours a day, sitting up to six hours a day with the opportunity to stretch for two to three minutes every half hour with a need to elevate the right lower extremity up to twelve inches as needed would be unable to perform the kinds of work Plaintiff had previously performed. (Tr. 952-53.) The VE stated that an individual with that set of limitations could perform work as a lens inspector, film inspector, dowel inspector, charge account clerk, address clerk, or order clerk according to the Dictionary of Occupational Titles ("DOT"). (Tr. 954.)

## II. ANALYSIS

### A. Standard of Review

A claimant must prove that she is disabled for purposes of the Act to be entitled to social

security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of

8

performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. §405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment but, rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court now turns to the merits of the case.

### B. Issues for Review

Plaintiff argues that (1) the ALJ failed to properly evaluate her under the *per se* disabling medical listings; (2) the ALJ failed to properly weigh the medical source opinions; (3) the ALJ failed to properly consider Plaintiff's obesity; (4) the ALJ failed to properly evaluate Plaintiff's credibility; and (5) the ALJ relied upon flawed VE testimony. Defendant counters that (1) substantial evidence supports the ALJ's decision; (2) the ALJ properly considered the medical listings; (3) the ALJ properly considered the medical opinion evidence; (4) the ALJ properly evaluated Plaintiff's credibility; and (5) the VE testimony was not flawed.

### C. Step Three Analysis

Plaintiff first contends that the ALJ's decision was not supported by medical evidence. At Step 3 of the analysis, a claimant may qualify for benefits without considering vocational factors if she meets or equals the criteria of one of the Medical Listings contained in Appendix 1. *Wren*, 925 F.2d at 125. The Commissioner's Regulations describe three ways that a claimant can "equal" a Medical Listing: (1) the claimant does not have one or more of the specified findings in the Listing or one of the specified findings is not severe enough, but other findings related to the impairment are equal in medical severity to the listed criteria; (2) the claimant has an impairment "closely analogous" to a listed impairment with findings of equal significance to a listed impairment; or (3) the claimant has a combination of impairments that, when combined, are equal in severity to those in a listed impairment. 20 C.F.R. § 404.1526(b)(1-3).

Listing 1.02A reads as follows:

"Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability), and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints.

With: A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively as defined in 1.00B2b"

Section 1.00B2b states the following:

"To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living . . . Therefore, examples of ineffective ambulation include, but are not limited to, . . . the inability to walk a block at a reasonable pace on rough or uneven surfaces"

Plaintiff argues that she meets or equals Medical Listing 1.02A. Plaintiff relies on medical images taken at Parkland Health and Hospital System to show she has a knee deformity caused by tri-compartmental degenerative joint disease. (Tr. 365-66.) Plaintiff also relies on Dr. Shade's medical records to show that she suffers from chronic pain, stiffness and limited motion in the joint (Tr. 300-01.) Finally, Plaintiff relies on Dr. Goldberg's Work-Related Activities Statement to show that she is unable to ambulate effectively. (Tr. 668.)

Defendant argues that the ALJ correctly determined that Plaintiff's impairment does not meet or equal a listed impairment. The ALJ found that "the medical history and other evidence of record do not entirely substantiate the intensity and persistence of pain as alleged by the claimant or the effect the impairments have on the claimant's ability to work." (Tr. 75.) Though the ALJ did not provide much explanation, he seemed to rely primarily on the medical opinion evidence provided by the Medical Expert ("ME"), Dr. Moore, when making this Step 3 determination. The ME opined that "the claimant's impairments did not rise to the level of severity to meet or equal a listing level impairment." (Tr. 73.) The ME also opined that "the medical evidence supports that the claimant would be capable of performing sedentary exertional activity on a sustained basis." (Tr. 73.) The ALJ ultimately found that "[Plaintiff] should be able to perform a full range of exertional activities necessary to perform sedentary work." (Tr. 75.) In finding that Plaintiff has the ability to ambulate effectively, the ALJ relied on evidence that Plaintiff was "able to grocery shop, clean and run errands." (Tr. 75.) The ALJ made this determination after discounting the medical opinion of Dr. Shade, a treating source. As the Court notes in the following section, the decision to discount Dr. Shade's medical opinion is not supported by substantial evidence.

Defendant also disputes Plaintiff's reliance on Dr. Goldman's 2007 report and alleges that he "is bending over backwards to support [Plaintiff's] application for disability benefits." (Doc. 13, p. 10.) Defendant asserts that Dr. Goldman "provides no objective support for his medical conclusions." (Doc. 13, p. 10.) These assertions are baseless. Dr. Goldman reviewed Dr. Shade's records from 1998 through the time the report was written and outlines each attempt to treat Plaintiff's injuries. (Tr. 639-41.) Dr. Goldman's conclusion that Plaintiff is disabled is "[b]ased on numerous evaluations by Dr. Shade, diagnostic testing, reference to restriction of motion of her knee, and failure of improved knee function after undergoing surgical instillation of Steroids and Arthroscopic Surgery of her knee and no requiring a Total Joint Replacement." (Tr. 640.) Dr. Goldman further observes that Plaintiff was disabled since her surgery which "identified permanent articular changes to the knee." (Tr. 640.) The Court notes nothing in the record that suggests Dr. Goldman was "bending over backwards" as Defendant suggests.

Defendant also argues that "Dr. Goldberg's findings do not support [Plaintiff's] allegations of an inability to ambulate effectively." (Doc. 13, p. 12.) First, Defendant observes that Dr. Goldberg's statement of disability was submitted after the expiration of Plaintiff's insured status in March of 2004. It is true that Dr. Goldberg's examination of Plaintiff occurred after her insured status expired, however, evidence obtained after the expiration of a claimant's insured status may still be probative as to the claimant's injuries and/or disabilities. Also, Defendant seems to argue that Dr. Goldberg's report is evidence of Plaintiff's ability to ambulate effectively. (Doc. 13, pp. 11-12.) Dr. Goldberg observed that Plaintiff "had up to 110 degrees of flexion in her knees," "could stand and walk up to two hours in an eight hour work day," and "could use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare simple meals, and

take care of her personal needs." (Tr. 661-68) However, none of these statements are inconsistent with Dr. Goldberg's opinion that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces. The ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The proper inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Id.* Under this standard, Defendant's arguments against the medical opinion evidence provided by Drs. Goldberg and Goldman must fail. Accordingly, the Court holds that the ALJ's Step 3 decision is not supported by substantial evidence.

### *D. Weighing the Medical Source Opinions*

Plaintiff argues that the ALJ failed to properly weigh the medical source opinions by not indicating what weight was given to any of the medical sources of record. The ALJ is required to give controlling weight to a treating physician's opinion if the ALJ finds that opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *See* 20 C.F.R. § 404.1527(d)(2). In many cases, a treating physician's opinion is entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. *See* SSR 96-2p. A treating physician's opinion, however, may be disregarded when good cause is shown. *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir.1994); *Leggett*, 67 F.3d at 566. If good cause exists, then the ALJ may accord the treating physician's opinion less weight, little weight, or even no weight. *Paul*, 29 F.3d at 211; *Leggett*, 67 F.3d at 566. "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir.1995) (citation omitted). If the ALJ does not accord a treating-doctor's opinion controlling weight, the ALJ must set forth specific

reasons for the weight given, supported by the evidence in the case record. *See* 20 C.F.R. § 404.1527(d)(2). The reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. The ALJ must explain this reasoning in the decision, and the weight given to an opinion will stand or fall on the reasons set forth in the opinion. *Newton*, 209 F.3d at 455.

Here, the ALJ is required to give controlling weight to Dr. Shade's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. When remanding this claim, the Appeals Council specifically directed the ALJ "to evaluate and address [Dr. Shade's] opinion evidence and explain what weight, if any was accorded to it." (Tr. 110.) While the ALJ may not have specifically provided the weight he assigned the medical opinion evidence in perfect narrative fashion, he did explain that Dr. Shade's statement of disability was discounted "because it was not supported by the objective evidence of record and the additional findings in his additional medical reports." (Doc. 13, p. 15.) To support this claim, Defendant's brief cites to pages four and five of the ALJ opinion. There, the ALJ argues that Plaintiff cannot be disabled because she can grocery shop, clean, and cook for herself. (Tr. 73-74.) Although this explanation is sufficiently specific to satisfy the Appeals Council's mandate, the reasons given by the ALJ do not amount to substantial evidence capable of supporting the ALJ's decision. As previously noted, the ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

Read as a whole, the record does not yield such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ. On August 1, 2005, Dr. Shade noted that Plaintiff had

flare ups of her bilateral knee and lower back problems at least two to three times a year that would incapacitate her from two to three days per episode and opined that she was "permanently disabled." (Tr. 296.) Later, in 2009, Dr. Shade opined that Plaintiff was limited in prolonged standing, walking, bending, stooping, lifting, carrying, squatting, and climbing due to her degenerative condition. (Tr. 723.) Dr. Goldberg reported that Plaintiff needed a cane to ambulate more than five yards and that she could not walk a block at a reasonable pace on rough or uneven surfaces. (Tr. 664-68.) Additionally, Dr. Goldman opined that Plaintiff "is permanently disabled from any type of employment and this has been documented by Dr. Shade since he began treating her in 1998." (Tr. 640.) Although Plaintiff testified that during the day she would "try to do a little cleaning or something around the house," she has to stop frequently to rest. (Tr. 875; 935.) She also testified that she spent most of the day sitting or lying down with her legs elevated. (Tr. 935.) Plaintiff lives with her father, who pays someone to come and clean the house. (Tr. 874.) After review of the record, it is clear that the medical evidence overwhelmingly supports Dr. Shade's opinion and that the only evidence in the record that seems to contradict Dr. Shade is that of the state agency ME. Accordingly, the Court holds that the ALJ failed to show good cause for disregarding Dr. Shade's opinion.

Based on the foregoing, the Court finds that the case should be reversed and remanded for reconsideration. Although the Court does not find it necessary to address the Plaintiff's remaining arguments, the Court does note its concern regarding the ALJ's cursory analysis. The ALJ declined to include explanations of how he weighed the various medical opinions and which facts he found compelling despite being specifically instructed to do so by the Appeals Council. (Tr. 110-11.) The

ALJ also failed to explain the effect Plaintiff's obesity had on his analysis pursuant to Social Security Ruling 02-1p. The ALJ should consider elaborating his positions upon remand.

### III. RECOMMENDATION

For the foregoing reasons, the Court hereby recommends that the Commissioner's decision be REVERSED and REMANDED for reconsideration in line with this opinion.

SO RECOMMENDED, July 28, 2011.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a de novo determination by the District Court. See Thomas v. Arn, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).